IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *Plaintiff* | § § § § § § § § § § § § § | |
| **v.** | | **P:25-CR-00173-DC** |
| **(1) JAVIER ALEJANDRO GAMBOA VALADEZ, (2) JOSE BENJAMIN HERNANDEZ,** *Defendant* | | |

## ORDER

BEFORE THE COURT is Defendant Javier Alejandro Gamboa Valadez's Motion to Suppress Evidence,[1] to which Defendant Jose Benjamin Hernandez joined,[2] and Defendants' Joint Supplemental Motion to Suppress.[3] Defendants raise Fourth Amendment challenges to the initial traffic stop, the use of digital surveillance technology, the duration of the traffic stop, the voluntariness of Gamboa Valadez's consent to search the car, and the use of a drug-sniffing dog to search the vehicle. These arguments are unavailing and the Court **DENIES** the motions.

## FACTUAL BACKGROUND

On August 13, 2025, Reeves County Sheriff's Office ("RCSO") Lieutenant Michael Jurado observed the Defendants on Interstate 20 failing to maintain a safe distance from the vehicle in front of them and commenced a traffic stop. He had had seen this same van in July 2025 while monitoring his Flock vehicle surveillance system near the I-10 and I-20

---

[1] Doc. 32.
[2] Doc. 33.
[3] Doc. 48.

junction. The Flock system revealed that the van had made several rapid trips to Atlanta, Georgia, a pattern of travel that Lt. Jurado believed to be suspicious and consistent with alien or drug smuggling.

After obtaining Gamboa Valadez's license and registration, Lt. Jurado questioned him and his passenger, Hernandez, about their travel itinerary and their past history of travel. Gamboa Valadez relayed that they drive to automobile auctions weekly for their business, and on this occasion were headed to Odessa, Texas. He also told Lt. Jurado that they never travelled outside of Texas. Lt. Jurado testified that he believed they were lying at the time based on his knowledge that this van had made several rapid trips to Georgia and his belief that Odessa did not have any automobile auctions.

After three minutes, Lt. Jurado asked Gamboa Valadez to sit with him in the front seat of the patrol car while he ran computer checks on the Defendants' licenses and registration. While completing these checks, Lt. Jurado informed Gamboa Valadez that he was issuing a warning and then continued to ask questions about the purpose of their travel. It was revealed that the Defendants would travel to automobile auctions to pick up vehicles and parts to transport back to Mexico. On this particular trip, however, they were headed to the Copart Automobile Auction in Odessa. But Lt. Jurado knew that auction was in Andrews, Texas, not Odessa.

Approximately sixteen minutes after the stop began, Lt. Jurado confirmed that Gamboa Valadez was the lawful bailee operator of the vehicle and then asked for consent to conduct a search. Gamboa Valadez consented to a search of the interior and exterior of the van as well as all luggage in the van. He also consented to the use of a drug-sniffing dog in

the search. However, when asked if he would allow Lt. Jurado to take the van to a workshop to conduct the search, Gamboa Valadez refused.

Lt. Jurado is a K-9 officer and had a dog with him, but called for a more experienced narcotics dog to assist with the search because his dog was in training. While awaiting the arrival of the dog, Lt. Jurado utilized a portable x-ray device to scan the vehicle and discovered a hidden compartment, although he could not determine the contents. This was the same area where the narcotics canine eventually alerted. Determining they had probable cause upon the dog's alert, the officers transported the van to a workshop where they discovered over 100 pounds of cocaine hidden inside a table located in the back of the van.

The Court held an inordinately long two-day suppression hearing on the motions beginning January 14, 2026, then resuming and finally concluding on January 16, 2026.

## LEGAL STANDARD

The Fourth Amendment guarantees the right of the people to be free from unreasonable searches and seizures of their "persons, houses, papers, and effects."[4] To prevent infringement on this right, the Supreme Court established the exclusionary rule to bar the admission of evidence obtained as a result of a Fourth Amendment violation at trial.[5] The exclusionary rule is not an individual right, nor is it automatically triggered by every Fourth Amendment violation.[6] Instead, the rule "applies only where it result[s] in appreciable deterrence"[7] to law enforcement.

---

[4] U.S. CONST. amend. IV.
[5] *Herring v. United States*, 555 U.S. 135, 139 (2009).
[6] *Id.* at 140 (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)).
[7] *Id.* at 141 (citation modified).

Generally, the proponent of a motion to suppress bears the burden of establishing, by a preponderance of the evidence, that his Fourth Amendment rights have been violated.[8] However, when the search or seizure is conducted in the absence of a warrant, the burden shifts to the government to establish, by a preponderance of the evidence, that the search or seizure was constitutional.[9] It is undisputed that the search of the van was conducted without a warrant, and as such, the government bears the burden of proving the search was constitutional.

## ANALYSIS

At its core, the Fourth Amendment "seeks to secure the privacies of life against arbitrary power," while also placing "obstacles in the way of a too permeating police surveillance."[10] Solidifying the idea that the Fourth Amendment "protects people, not places," *Katz v. United States* expanded the doctrine beyond principles of common-law trespass and property rights to encompass "certain expectations of privacy."[11] Drawing from Justice Harlan's concurring opinion in *Katz*, courts find that the Fourth Amendment attaches when a person exhibits "'an actual (subjective) expectation of privacy'" and that expectation is one "'that society is prepared to recognize as reasonable.'"[12]

However, it is well established that a person who is "aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a

---

[8] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

[9] *Id.*

[10] *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (citation modified).

[11] *Id.* at 304 (quotation removed).

[12] *United States v. Smith*, 110 F.4th 817, 831 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 356, 223 L. Ed. 2d 191 (2025) (quoting *Katz*, 389 U.S. at 361 ((Harlan, J., concurring) (citation modified)).

4

third person's premises or property has not had any of his Fourth Amendment rights infringed."[13] Only a defendant whose Fourth Amendment rights have been violated may benefit from the protection of the exclusionary rule.[14] Through this lens, it becomes clear that both Defendants have standing to bring Fourth Amendment challenges.

Defendant Gamboa Valadez, as the driver of the vehicle, has standing to challenge the initial seizure as well as the subsequent search of the van on Fourth Amendment grounds. A person "who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."[15] Reflecting this, the Supreme Court made clear in *Terrence Byrd v. United States* that a driver in lawful possession of a vehicle is not stripped of a reasonable expectation of privacy therein merely because he is not the owner or the individual listed on the vehicle rental agreement.[16] Applying *Terrence Byrd*, Gamboa Valadez, as the bailee operator of the van, has a reasonable expectation of privacy in the vehicle and standing to challenge any unlawful search and seizure of his person and the van.

Whereas, Defendant Hernandez, the passenger, does not have the same degree of standing. A passenger's Fourth Amendment rights are not violated when law enforcement unlawfully searches the vehicle the passenger was riding in but holds no ownership interest in.[17] However, a passenger with no ownership interest in the vehicle may challenge the evidence obtained as a result of an allegedly unlawful traffic stop of the vehicle because the

---

[13] *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).
[14] *Id.*
[15] *Id.* at 143 n.12.
[16] *Terrence Byrd v. United States*, 584 U.S. 395, 411 (2018).

[17] *See Rakas*, 439 U.S. at 148.

traffic stop and detention that follows constitute a seizure of the persons of everyone in the vehicle.[18]

## I.    The Initial Stop

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[19] Moreover, law enforcement officers have "broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justification for their actions."[20] However, that legal justification must be objectively grounded.[21]

Texas Transportation Code Section 545.062 states "[a]n operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding . . . or veering into another vehicle, object, or person on or near the highway."[22] The Transportation Code does not rely on a definite measurement to determine when a vehicle is following too closely; instead, law enforcement officers must use their discretion to determine when a violation has occurred in light of the relevant conditions set out in the code.[23]

The legal justification for the traffic stop in this case was Lt. Jurado personally observing the Defendants commit the traffic violation of following too closely behind another vehicle. The lieutenant's suspicion that the van may be involved in alien or drug

---

[18] *See Brendlin v. California*, 551 U.S. 249, 257–59 (2007).
[19]  *Whren v. United States,* 517 U.S. 806, 810 (1996).
[20] *United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999).
[21] *Id.* (citation modified).
[22] Tex. Transp. Code Ann. § 545.062(a).
[23] *Cf. id.*

smuggling is irrelevant. Although the speed of the vehicles is unknown, there was little to no traffic on the roadway and there is no evidence of hazardous conditions. After pulling the Defendants over, Lt. Jurado informed Gamboa Valadez the reason for the stop and explained to him that the rule of thumb is the three-second rule—that a vehicle should maintain a three-second following distance from the car it's behind. In response, Gamboa Valadez admitted to the violation by stating, "[y]es, I did get a little close." Considering the road conditions, Lt. Jurado's twelve years of experience enforcing traffic violations, and Gamboa Valadez's confession to committing a traffic violation, the Court is satisfied that the legal justification for the stop was objectively grounded.

## II.     Digital Surveillance

The Defense also challenges the use of the automated license plate reader ("ALPR") commonly referred to as "Flock," arguing it is an unconstitutional means of mass surveillance and its use in this case violated the Defendants' expectation of privacy in their movements.

In the modern age, technology is everywhere and constantly evolving. While these evolutions bring about great benefits to society, they also bear inherent risks of abuse. As technology advances and becomes more pervasive, so too does the government's "capacity to encroach upon areas normally guarded from inquisitive eyes."[24] Not wanting to leave the citizenry "at the mercy of advancing technology," the Supreme Court rejects a "mechanical interpretation" of the Fourth Amendment.[25] Because the focus is on people, not places, a

---

[24] *Carpenter v. United States*, 585 U.S. 296, 305 (2018).
[25] *Kyllo v. United States*, 533 U.S. 27, 35 (2001).

person "does not surrender all Fourth Amendment protections by venturing into the public sphere."[26]

However, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."[27]    Understanding this, a person "travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[28] A car has "little capacity for escaping public scrutiny" as it travels public thoroughfares "where both its occupants and its contents are in plain view."[29] Moreover, a motor vehicle's "function is transportation and it seldom serves as one's residence or as the repository of personal effects." Conversely, some things, like cell phones, have become so integral to our way of life that a person does not shed their expectations of privacy in them even when they are exposed to the public.

In *Carpenter v. United States*, the police, without a warrant, obtained 127 days' worth of cell-site location information ("CSLI") from the defendant's cell-service provider.[30] The police then used this data to place the defendant at and near the scenes of various robberies.[31] This location data is collected regardless of whether a phone is in public or private, without an affirmative action taken by the cell phone owner.[32] Distinguishing cell phones from cars, the Supreme Court established that a cell phone has almost become "a

---

[26] *Carpenter*, 585 U.S. at 310.

[27] *Katz v. United States*, 389 U.S.347, 351 (1967).

[28] *United States v. Knotts*, 460 U.S. 276, 281 (1983).

[29] *Cardwell v. Lewis,* 417 U.S. 583, 590 (1974) (plurality).

[30] *Carpenter*, 585 U.S. at 312.

[31] *Id.* at 312.

[32] *Id.* at 315.

feature of human anatomy," and thus presents an even greater privacy concern than using a GPS to monitor a car.[33] Taking it further, the Court observed that

> [w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.[34]

Given the amount of private information the data revealed, the ease at which the government could access the data, and the ability of the government to go back in time to know information that was previously unknowable, the court found that the defendant's expectation of privacy in the whole of his physical movements was violated.[35]

### A.    What is Flock?

Flock Safety is a private technology company that provides law enforcement with a system of automatic license plate reading ("ALPR") cameras and an affiliated search database.[36] These cameras, operating like a standard license plate reader, capture high-speed photographs of every passing car along the public roadways where cameras are stationed.[37] But what makes these cameras advanced is that they also capture every vehicle's make, color, type, missing plates, covered plates, paper plates, and over twenty unique vehicle details like

---

[33] *Id.* at 311 (citation modified).

[34] *Id.*

[35] *Id.* at 311–13.

[36] Flock Safety, *Why Flock?*, https://www.flocksafety.com/blog/why-flock#:%7E:text=What%20evidence%20is%20needed%20to,drives%20by%2C%20day%20or%20night (last visited February 25, 2026).

[37] *Id.*

roof racks and bumper stickers.[38] Once a photograph of a passing vehicle is taken, it is uploaded to the Flock encrypted cloud servers.[39] Photos are stored on the cloud server for thirty days and then permanently deleted, unless they are downloaded to the local network.[40]

After uploading a photograph, law enforcement can search the photograph database by cataloged vehicle characteristics and by specific license plate numbers.[41] Additionally, by integrating artificial intelligence and the National Crime Information Systems, officers can receive real-time alerts on passing vehicles.[42] While the local customer can access only their local network, access to that network can be shared with others by the local customer.[43] Once network access is shared, the system aggregates the Flock data across all linked networks to create a larger searchable database.[44]

### B. Applying *Carpenter* to Flock

The diminished expectation of privacy in one's vehicle acknowledged in *Carpenter* draws upon well-established law that forecloses the Defense's argument here. In *Cardwell*, the Supreme Court held that it was not a Fourth Amendment violation for police to examine the exterior of a car left in a public parking lot.[45] The Supreme Court found that because the exterior of a car is thrust into the public eye, examining it does not constitute a "search."[46] This announcement was echoed twelve years later in *New York v. Class*. There, the Supreme

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *See Cardwell v. Lewis*, 417 U.S. 583, 591–93 (1974).
[46] *Id.* at 592.

Court held that it was not a search for police to examine a vehicle identification number ("VIN"), because a VIN, like the exterior of the car, is thrust into the public eye.[47] Finally, the Fifth Circuit, drawing upon these principles, acknowledged in *Olabisiomotosho* that there is no privacy interest in one's license plate number.[48] The common trend among these cases is the defining principle that there is no privacy interest in the exterior of one's vehicle because it has been knowingly exposed to the public and is readily observable by everyone.

As stated above, Flock is an advanced license plate reader system that captures the license plate information of vehicles on public roadways in addition to the vehicle's make, model, color, and other defining exterior features. Every detail Flock cameras capture has been accounted for by the rulings in *Cardwell*, *Class*, and *Olabisiomotosho*. While this specific technology may be novel, the legal issue is not. Nothing Flock captures is subject to an expectation of privacy because every exterior feature of a vehicle has been thrust into the public eye.

Furthermore, the use of the Flock data in this case is distinguishable from the use of CSLI in *Carpenter*. Unlike CSLI's "all-encompassing and near-perfect surveillance of a cell phone user's comings and goings,"[49] ALPRs, like Flock, are limited as to the quantity and quality of data they can collect. Flock cameras are isolated to public roadways, limited in number, and only capture the exterior details of passing vehicles. These limitations prevent the same type of invasive surveillance that raised concerns in *Carpenter*. CSLI is continuously

---

[47] *New York v. Class*, 475 U.S. 106, 113–14 (1986).

[48] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999).

[49] *United States v. Jackson*, No. 24-CR-10010-JWB, 2025 WL 1530574 at *8 (D. Kan. May 29, 2025) (quoting *United States v. Bowers*, No. 2:18-CR-00292-DWA, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021)) (citation modified) (upholding the constitutionality of Flock by distinguishing it from CSLI in *Carpenter*).

collected so long as a cell phone is turned on, regardless of whether the phone is in public or private. Whereas Flock cameras cannot track individuals when they are outside their respective vehicles or within private areas, reducing the risk that law enforcement will invade the "privacies of life." As the Supreme Court said, "[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time."[50]

Notably, the ruling in *Carpenter* left intact the idea that there is no expectation of privacy in one's movements through a public roadway. Drawing on this well-established principle, the Court is not convinced that the limited surveillance capacity of the Flock automated license plate readers, or searching the Flock database, violates the Fourth Amendment.

## III.    The Duration of the Traffic Stop

Third, Defendants assert a Fourth Amendment violation on the basis that Lt. Jurado prolonged the traffic stop beyond the time necessary to complete the purpose of the stop: the issuance of a warning for following too closely. While there is "no constitutional stopwatch on traffic stops,"[51] a lawful traffic stop may become an unreasonable seizure if the stop is "prolonged beyond the time reasonably necessary to complete [the] mission" of the stop.[52] The Fourth Amendment tolerates certain unrelated inquiries during a lawful traffic stop, but the officer may not pursue these unrelated inquiries in a manner that prolongs the stop, "absent the reasonable suspicion ordinarily demanded to justify detaining an

---

[50] *Carpenter v. United States*, 585 U.S. 296, 311 (2018).
[51] *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004).
[52] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

individual."[53] Thus the pertinent question to determine whether a detention extends "beyond a reasonable duration is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."[54] To that end, the Fifth Circuit held in *United States v. Pack*, that a detention is not unlawfully prolonged when:

> (1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the entire detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity.[55]

Defendants argue that they were subject to extensive questioning while Lt. Jurado made "no pretense of even issuing a warning or citation related to the asserted reason for the stop."[56] Further, they contend that Lt. Jurado exceeded the scope of his mission by asking vague questions unrelated to the stop in order to draw out the stop. However, this is a factually flawed and legally dubious argument.

Sixteen minutes elapsed from the initiation of the traffic stop and Gamboa Valadez's consent to search the vehicle. At the commencement of the stop, Lt. Jurado obtained the

---

[53] *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).
[54] *Brigham*, 382 F.3d at 511 (citation modified).
[55] *United States v. Pack*, 612 F.3d 341, 358 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010).
[56] Doc. 32 at 16.

Defendants' licenses and the vehicle registration information before asking any questions. After informing Gamboa Valadez that he would be receiving a warning but before beginning computer checks, Lt. Jurado began an inquiry into the Defendants' travel itinerary, their travel history, and the purpose of their travel. Such inquiries are permissible because they are "reasonably related in scope to [an officer's] investigation of the circumstances that caused the stop."[57] Furthermore, it is not impermissible to conduct such inquiries prior to running the ordinary computer checks that accompany a traffic stop.[58] Regardless, these questions did not cause a meaningful delay given that the computer checks began a mere two minutes later. Moreover, these inquiries were specifically targeted at resolving the suspicion he had prior to the stop that the van was involved in smuggling.

Lt. Jurado testified that through these initial inquiries he believed Gamboa Valadez was lying to him about their travel history because they said they never drove out of the state. This was contradictory to the Flock information known to Lt. Jurado at the time of the stop, thereby supporting his reasonable suspicion that the van could be involved in smuggling. Given that conducting computer checks on a driver's information is well within the scope of the mission of a traffic stop, the decision to continue talking to Gamboa Valadez while running those checks was an efficient strategy to simultaneously resolve Lt. Jurado's suspicions and complete the traffic stop.[59] The Fifth Circuit approved such a

---

[57] *Pack*, 612 F.3d at 350.

[58] *Brigham*, 382 F.3d at 511 (noting that there is no "per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions.").

[59] *Rodriguez*, 575 U.S. at 355 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding

strategy in *Shabazz*. There, the Fifth Circuit expressed that questioning an individual while waiting for the results of a computer check does nothing to extend the duration of the seizure.[60] Similar to the defendant in *Shabazz*, Gamboa Valadez consented to a search of the van prior to the completion of the computer checks.[61] This consent was never revoked, even after being told another drug-sniffing dog would need to be called to the scene. As such, the Court arrives at the same conclusion as the *Shabazz* court.

The Court is convinced that the stop was not unlawfully prolonged. Alternatively, even if sixteen minutes could be considered a prolonged stop to issue a warning, the Court is satisfied that there was sufficient reasonable suspicion that arose during the stop to justifiably prolong the stop at least until the moment consent to search was given.

## IV.    Voluntariness of Consent

Next, Defendant Gamboa Valadez challenges the voluntariness of his express consent to search the van. Consent must "be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'"[62] The relevant factors for determining the voluntariness of an individual's consent to search include:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[63]

---

warrants against the driver, and inspecting the automobile's registration and proof of insurance." (quoting *Illinois v. Caballes*, 543 U.S. 405, 408)).

[60] *Cf. United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993).

[61] *Cf. Id.*

[62] *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49 (1973)).

[63] *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997) (quotation removed).

Although all six factors are relevant, "no single factor is dispositive or controlling of the voluntariness issue."[64] On balance, these factors favor finding that the consent in this case was freely and voluntarily given.

Although Gamboa Valadez was told to sit in the patrol car, Lt. Jurado did not yell at or threaten him, nor did Lt. Jurado draw his weapon.[65] While it can be argued that sitting in a patrol car is coercive, Gamboa Valadez was sitting unrestrained in the front seat with Lt. Jurado, not in the back where he would be if under arrest. Any coercive impact, if any, of sitting in the patrol car was therefore significantly mitigated. Gamboa Valadez was repeatedly asked if he consented to the search of the entire van, including the luggage inside, and he consistently agreed. In fact, Gamboa Valadez aided the search by voluntarily offering to allow Lt. Jurado to run his dog through the vehicle. Such an offer also evidences Gamboa Valadez's belief that neither Lt. Jurado nor a dog would discover narcotics in the van. Finally, Gamboa Valadez's knowledge of his right to refuse consent may be inferred from the facts. After giving consent to search the van, he refused Lt. Jurado's request to conduct the search at a nearby workshop. Had Gamboa Valadez been unaware of his right to refuse consent, he would not have felt free to refuse this request.

Through his consent, a search was authorized. Lt. Jurado was permitted to search the entire framework of the car, including the luggage inside, and to bring a dog into the van to

---

[64] *Id.*

[65] *See United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008) (finding that there was no coercion where officers did not have their weapons drawn and did not yell at or threaten the defendant); *see also United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011) ("The officers were not pointing their firearms at anyone and were not threatening [at the defendant] or shouting. They were merely standing in Martinez's living room while engaging him in a relatively polite conversation about the events of that night and the location of the guns in question.").

search for concealed contraband. And that is precisely what Lt. Jurado and the Reeves County Sheriff's Office did. The search of the van involved a manual inspection of the interior and exterior, an x-ray scan of the interior of the van, and the use of a drug-sniffing dog to check inside and outside the van for the presence of narcotics. All of these investigative steps fit comfortably within the express scope of consent and, as the bailee operator of the vehicle, Gamboa Valadez was authorized to consent to such a search.[66]

## V.    Probable Cause Based on the Dog Sniff

In their supplemental motion to suppress, the Defense challenges the officers' probable cause determination based on a drug-sniffing dog's alert to the presence of narcotics.[67] Specifically, the Defense argues that the drug-sniffing dog, Kong, did not adequately alert to the possible presence of narcotics to give rise to probable cause and that Kong's training and deployment records indicate that the canine is unreliable.

The Court disagrees. Sgt. Anthony Ramon was the canine handler called out to the scene with Kong. He ran Kong along the exterior of the van, noting that the dog was interested in the driver-side tire, but did not alert. Kong was then directed to search the interior of the van. Once Kong reached the front of the van, near the hidden compartment, Sgt. Ramon observed a behavioral change, which, according to his testimony, is the dog's normal positive alert. Based on his thirty-three years' experience handling and training

---

[66] *Cf. United States v. Freeman*, 482 F.3d 829, 832 (5th Cir. 2007) (observing that even when consent is voluntarily given, the search must not exceed the scope of consent and the person consenting must have the authority to do so).

[67] This argument was not included in the original motion to suppress, but rather, was orally raised for the first time on the first day of the hearing. Upon the Court's questioning, the Defense was unable to identify where in their briefing this argument was raised, despite the Defense's protests that it was. Thus, a supplemental motion was filed between the first and second day of the hearing to backdoor the challenge into the hearing.

canines and his role as Kong's handler, Sgt. Ramon confirmed this behavioral change as a positive alert.

The Defense argues that the alert given was insufficient. However, this argument is undercut by the testimony of the Defense expert, Jerry Potter. At the hearing, in support of Sgt. Ramon's testimony, he acknowledged that not every dog is trained to sit when giving an alert. Furthermore, the expert could not confidently state that a behavioral change did not occur because the facial reaction was not observable on the body camera footage. Based on the testimony of Sgt. Ramon, his experience as a canine handler generally, and his experience handling Kong in particular, the Court is convinced there was an alert to the presence of narcotics based on Kong's behavioral change, as observed by Sgt. Ramon.

Secondly, the Defense argues that Kong is not a reliable drug-sniffing dog because he had been out of the field for three months prior to the traffic stop and he had only been deployed twice in the preceding year. This argument is similarly unavailing. According to Sgt. Ramon, Kong had been out of the field for three months prior to the search due to an unexpected loss in the handler's family. However, despite this, Kong had recently been recertified as a drug-sniffing dog five months prior to the present search, establishing Kong's field-readiness. In addition to receiving weekly training, Kong and his handler were primarily assigned to training other law enforcement canine units, which explains the gaps in his deployment record. As such, it is evident that even though Kong was limited in his deployments in 2025, his constant training and recent recertification establishes his reliability

as a drug-sniffing dog.[68] Therefore, reliance on Kong's positive alert in this case was not unreasonable.

Even though a "drug-sniffing canine alert is sufficient, standing alone, to support probable cause for a search,"[69] the canine alert does not stand alone in this case. Prior to Kong's arrival, Lt. Jurado scanned the entire van using a NightHawk portable x-ray device. In the front of the van, x-ray images revealed an unknown object in a hidden compartment between the passenger and driver's seats. The existence of such a compartment has been found to support probable cause.[70] Further, this was the area of the vehicle where Kong alerted. The officers then transported the van to a workshop to conduct a more thorough search, uncovering the cocaine at issue inside a makeshift table in the van.  Given the positive alert of a drug-sniffing dog and the x-ray images revealing a hidden compartment inside the van, the Court is more than satisfied that the search was supported by probable cause.

## CONCLUSION

Based on these reasons, the Court finds that the Defendants' Fourth Amendment rights were not violated by the initial seizure, the use of the Flock system, the length of the traffic stop, or the use of the narcotics dog. Further, the Court finds that consent to search the van was freely and voluntarily given.

---

[68] *Cf. Fla. v. Harris*, 568 U.S. 237, 249–50 (2013) (finding similarly a drug-sniffing dog reliable where the training record demonstrated the dog completed training courses in prior years, was certified, and underwent four hours of training each week).

[69] *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000).

[70] *United States v. Banuelos-Romero*, 597 F.3d 763 (5th Cir. 2010) ("We have previously held that evidence of a non-standard hidden compartment supports probable cause.").

Accordingly, the Defendants' Motions to Suppress[71] are **DENIED**.

It is so **ORDERED**.

SIGNED this 28th day of February, 2026.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE

---

[71] Docs. 32, 48.